UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BROGIN SOUSA, *by his Mother and/or Next Friend Jennifer L'Heureux*,<br><br>Plaintiff,<br><br>v.<br><br>COLLEGIATE CHARTER SCHOOL OF LOWELL,<br><br>Defendant. | ) | Civil Action No. 23-CV-12173-AK |

**MEMORANDUM AND ORDER ON COLLEGIATE CHARTER SCHOOL OF LOWELL'S MOTION FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

Plaintiff Brogin Sousa ("Sousa") by his mother Jennifer L'Heureux ("L'Heureux") sued Defendant Collegiate Charter School of Lowell ("CCSL") for, *inter alia*, a failure to adhere to Sousa's Individualized Education Plan ("IEP"), negligence, negligent supervision, intentional infliction of emotional distress, and violations of Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), and 42 U.S.C. Section 1983 claims. [Dkt. 1].

CCSL now moves for summary judgment [Dkt. 52], arguing that Sousa failed to exhaust his administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), that he cannot make out the elements of intentional infliction of emotional distress, and that he cannot prove damages absent expert testimony. The exhaustion argument fails because the requirement does not apply in cases, such as this, where the plaintiff seeks only compensatory damages. His state-law claims, however, also cannot survive, because Massachusetts recognizes no fiduciary

duty running from a public school to its students; the Massachusetts Tort Claims Act immunizes CCSL from negligence claims premised on omissions rather than affirmative acts; and the Act expressly exempts intentional torts. The Section 1983 claim likewise fails for want of any policy or custom attributable to the school. What remains are Sousa's Rehabilitation Act claims of discrimination and hostile learning environment, as to which the record presents genuine disputes of material fact. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

CCSL is a public charter school in Massachusetts that receives federal financial assistance. [Dkt. 53 ¶¶ 1-2]. From 2018 to 2022, Sousa attended first, second, and third grade at CCSL. [Id. ¶ 3]. Sousa's primary care physician, Dr. Kenneth Yoffe ("Dr. Yoffe"), diagnosed him with a mood disorder and ADHD, and he has also been described as suffering from anxiety. [Id. ¶¶ 5-6, 11, 18-19].

On October 25, 2021, CCSL proposed a revised IEP for Sousa to address an emotional disability, covering the period from October 19, 2021, through October 28, 2022, during Sousa's third-grade year. [Id. ¶ 25]. L'Heureux partially rejected the IEP, requesting additional provisions and that CCSL contract a board-certified behavioral analyst to perform a functional behavioral assessment ("FBA"). [Id. ¶¶ 26-27].

On November 29, 2021, L'Heureux submitted a "written statement of concern" ("PRS 6468") via the Problem Resolution System ("PRS"), reviewed by the Massachusetts Department of Elementary and Secondary Education ("DESE"), alleging CCSL was not fully implementing Sousa's IEP and had failed to respond timely to the FBA request. [Id. ¶¶ 28-29]. The FBA was not completed until February 8, 2022. [Id. ¶ 38]. On December 6, 2021, L'Heureux conditionally

accepted the IEP, which included accommodations such as allowing Sousa to sleep during the day if fatigued from medication and to access the school's social worker as needed. See [Dkt. 53 ¶ 30].

On February 9, 2022, during recess, which was held outside the school's front entrance due to snow accumulation, Sousa lay on the curb, and L'Heureux alleges a teacher yelled at him and yanked him off the ground. [Id. ¶¶ 31-32, 42]. CCSL asserts that staff merely helped Sousa up and that he complied on his own. [Dkt. 52 ¶ 34].

For at least 44 days after this incident, Sousa experienced panic attacks that L'Heureux attributed to school-related stress, resulting in continued absences. [Dkt. 53-3 at 52]. Dr. Yoffe provided a March 25, 2022, letter medically excusing these absences. [Id.]. Sousa returned to school around May 5, 2022. [Dkt. 53 ¶ 44].

On April 7, 2022, L'Heureux filed a second PRS complaint (PRS 7090), alleging that CCSL staff physically yanked Sousa and denied him access to the social worker required by his IEP. [Id. ¶¶ 40, 42-43]. DESE reviewed video footage and found "no indication of direct physical contact that prevented or significantly restricted [Sousa's] freedom of movement." [Id. ¶ 47]. DESE later closed PRS 6468 on March 27, 2023, after finding that CCSL had taken all requested corrective actions. [Id. ¶ 49]. L'Heureux did not appeal either closure. [Dkt. 53 ¶¶ 48-51].

Between February and June 2022, both DESE and the Massachusetts Department of Children and Families ("DCF") investigated CCSL's conduct toward Sousa. [Dkt. 52-6 at 96, 135]. DESE also found that CCSL failed to fully implement Sousa's IEP and did not respond timely to the November 29, 2021, FBA request. [Dkt. 52-6 at 98]. DESE determined that CCSL penalized Sousa for disability-related behaviors with daily conduct write-ups instead of

providing access to the school social worker as his IEP required. [Id.]. DESE also concluded that CCSL delayed the FBA process until February 2022 in violation of 603 CMR 28.05(1). [Id.].

DCF investigated allegations of neglect related to Sousa's denied accommodation to rest during the school day. [Dkt. 53-3 at 3-5]. Sousa's IEP, supported by Dr. Yoffe's medical request, allowed him to nap if drowsy due to his medication, guanfacine. [Id. at 31]. However, according to the report, a teacher, Mrs. Moriarty, stated she "does not have to follow" the IEP's additional information section, and another employee, Mr. Roman, admitted unfamiliarity with the IEP. [Id. at 30]. DCF found that staff removed Sousa's desk while he slept under it, creating a potential risk of harm. [Id. at 31]. On February 3, 2022, DCF substantiated the concern for neglect, citing reasonable cause to believe Sousa was neglected and that CCSL's inactions negatively impacted his mental health. [Id.]. Nonetheless, DCF determined further departmental involvement was unnecessary because L'Heureux had secured legal representation to address the school issues. [Id.].

## II. LEGAL STANDARD

At the summary judgment stage, courts must "pierce the pleadings and [] assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Courts may grant summary judgment where the record presents no "genuine issue of material fact" when viewed most favorably to the non-moving party, such that the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted). The Court must assess (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," entailing that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether the genuine factual dispute is material, such that it

"might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)). A non-moving party can "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). Courts can consider evidentiary submissions such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." See Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION[1]

CCSL presents three arguments in its Motion for Summary Judgment [Dkt. 52]. First, CCSL contends that Sousa failed to exhaust all administrative remedies, which is a prerequisite

[1] Although CCSL did not raise this issue with the Court, there remains a question as to whether all tort claims should be dismissed for an independent reason under Mass. Gen. Laws Ann. ch. 258, § 4. The statute provides: "A claimant cannot institute a civil action against a public employer for damages unless the claimant shall have first presented [their] claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose." Drake v. Town of Leicester, 484 Mass. 198, 199 (2020). Here, there is no indication that Plaintiff sent a presentment letter to the proper executive officer of the public employer before initiating the lawsuit. Compliance with this requirement is a prerequisite to filing suit. See Doe v. Cambridge Pub. Schs., 101 Mass. App. Ct. 482, 490 (2022) ("At bottom, we acknowledge that the presentment requirements of G. L. c. 258, § 4, may lead to harsh results. However, that is how the statute is written, and it is incumbent on plaintiffs to strictly comply with its requirements.") (reversing Superior Court judge on appeal regarding presentment where the School Superintendent, rather than the executive officer, received the letter) (internal citations omitted). Because the argument was not raised, the Court is reluctant to dismiss the State law tort claims on

for pursuing his federal claims under Counts VII, VIII, and IX under the Rehabilitation Act. Second, CCSL argues that even if the Court exercises supplemental jurisdiction over the remaining state law claims, Sousa cannot establish the elements of intentional infliction of emotional distress. Specifically, he cannot demonstrate either the requisite intent or severe emotional distress, as evidenced by the admissions in L'Heureux's deposition testimony. Third, CCSL asserts that Sousa cannot prove damages[2] for his tort claims because he has no expert testimony. The Court will address each of these Counts[3] in turn.

**A. Administrative Exhaustion**

The Court begins with CCSL's administrative exhaustion argument. As a general matter, "[n]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51 (1938). The requirement promotes judicial economy and respect for agency autonomy by permitting the agency to develop a factual record and bring its expertise to bear before a court intervenes. See McKart v. United States, 395 U.S. 185, 194 (1969).

The IDEA embodies that principle. However, the statute preserves other avenues of relief, providing that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under . . . title V of the Rehabilitation Act of 1973." At the

---

these grounds alone but notes there is no evidence of presentment and thus the claims likely should be dismissed for these reasons alone.

[2] As discussed later because the tort counts all fail on immunity grounds the Court need not reach the Damages argument.

[3] The Court notes that many of the MTCA arguments were not raised by Defendant as a ground for summary judgment. "However, if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, the particular legal argument relied on by the court need not have been suggested by the movant." Packish v. McMurtrie, 697 F.2d 23, 25 n. 1 (1st Cir. 1983) (citing 10 Wright & Miller § 2730).

same time, it conditions resort to those avenues: "before the filing of a civil action under [the Rehabilitation Act] . . . seeking relief that is also available under [the IDEA], the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(l). Those subsections establish a two-step process. They grant affected children and parents the right to a "due process hearing" before a local or state administrative official, Section 1415(f)(1)(A), followed by an "appeal" to the state education agency, Section 1415(g)(1). Luna Perez v. Sturgis Pub. Schs., 598 U.S. 142, 146 (2023).

Here, Sousa completed the first step but not the second. He proceeded under subsection (f) by submitting letters of concern to the DESE, yet he never appealed the closure of those letters to the Board of Special Education Appeals, as subsection (g) contemplates. [Dkts. 53-2 at 5; 54 at 4–5]. However, this does not defeat Sousa's federal claims. Count VII alleges that CCSL's "actions demonstrate willful and intentional discrimination and therefore, a claim for damages under § 504 of the Rehabilitation Act of [] 1973 is appropriate." [Dkt. 1 at 13 ¶ 78]. Count VIII likewise alleges "discriminatory conduct" in violation of Section 504. [Dkt. 1 ¶¶ 90, 93]. And Count IX asserts that CCSL "violated 42 U.S.C. sec. 1983 for denying [Sousa's] rights under sec. 504 of the Rehabilitation Act and is, therefore, liable for compensatory and punitive damages." [Id. ¶ 99]. L'Heureux confirmed as much at her deposition, testifying that she seeks "damages" for Sousa. See [Dkt. 52 at 12].

Because Sousa seeks only damages, relief unavailable under the IDEA, his federal claims fall outside the IDEA's administrative exhaustion requirement. See Doe v. Gavins, No. 22-CV-10702-ADB, 2023 WL 6296398, at *13 (D. Mass. Sept. 27, 2023) (collecting cases holding that exhaustion is not required where plaintiffs seek only damages rather than the equitable relief the

IDEA offers). Having found that Sousa did not need to exhaust administrative remedies before filing the instant suit, the Court next addresses the remaining causes of action.

**B. Breach of Duty of Care (Count I) and Breach of Duty of Care Via Respondeat Superior (Count II)**

While Plaintiff alleges breach of duty of care and breach of duty of care via respondeat superior courts in the First Circuit generally treat a "breach of duty of care" claim as one for breach of fiduciary duty rather than as duplicative of negligence. See Off. Comm. of Unsecured Creditors v. Meltzer, 589 B.R. 6, 29 (D. Me. 2018) (analyzing "breach of the duty of care" as a "fiduciary duty claim[]"); In re Enivid, Inc., 345 B.R. 426, 450 (Bankr. D. Mass. 2006) (treating "breach of the duty of care" as a "fiduciary duty of care" claim). To state such a claim, a plaintiff must allege: (1) a fiduciary duty arising from the parties' relationship, (2) breach of that duty, (3) damages, and (4) a causal connection between the breach and damages. Szulik v. State St. Bank & Tr. Co., 935 F. Supp. 2d 240, 275 (D. Mass. 2013). A fiduciary duty exists when one party places "faith, confidence, and trust in another's judgment and advice," which may arise either by law or from the nature of the parties' interactions. Doe v. Harbor Schs., Inc., 446 Mass. 245, 252 (2006). The circumstances giving rise to fiduciary relationships are "so varied that it would be unwise to attempt the formulation of any comprehensive definition." Warsofsky v. Sherman, 326 Mass. 290, 292 (1950).

Assuming *arguendo* that "breach of duty of care" is an independent cause of action, no fiduciary duty exists here beyond the general duty of care public schools owe their students. The Court is unaware of, and has not found any Massachusetts statute imposing a fiduciary duty on primary schools like CCSL, and Sousa identifies none. See Doe v. Town of Bourne, No. CIV.A.02-11363-DPW, 2004 WL 1212075, at *4 (D. Mass. May 28, 2004) (finding no statutory or constitutional basis for fiduciary duties of primary school employees to students). Courts are

also reluctant to create new fiduciary duties under state law. "Common law courts are not free to impose additional and likely conflicting fiduciary duties not imposed by statute." Squeri v. Mount Ida Coll., 954 F.3d 56, 67 (1st Cir. 2020). Because neither Sousa nor the Court has located any Massachusetts authority establishing that public schools owe students a fiduciary duty, the Court finds that CCSL owed no such duty. Accordingly, Counts I and II are **DISMISSED**.

**C. Negligence (Count III) and Negligent Supervision (Count IV)**

The MTCA limits the liability of public employers for claims premised on a negligent omission or failure to act. Specifically, with certain inapplicable exceptions, Mass. Gen. Laws Ann. ch. 258, § 10(j) provides immunity to public employees for:

> any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.

These immunities extend to suits which seek to hold public employers liable for their "failures to prevent harm." Brum v. Town of Dartmouth, 428 Mass. 684, 696 (1999).

Counts III and IV fail on this rule. CCSL qualifies as a public employer under the statute, see Mass. Gen. Laws Ann. ch. 71, § 89(k)(2), (y) (2022), and neither party disputes that CCSL falls within the MTCA's definition. Thus, CCSL employees fall within the ambit of Section 10(j)'s grant of immunity if Plaintiff alleges liability for their failure to prevent harm.

Counts III and IV do just that. Both sound in negligence, and both rest on what CCSL did not do rather than on any affirmative act. Count III alleges that CCSL failed to follow Sousa's IEP, and failed to follow his IEP accommodations. [Dkt. 1 ¶¶ 66-69]. Count IV, the negligent supervision claim, alleges that CCSL failed to supervise its employees, failed to follow Sousa's IEP, and failed to properly train its staff. [Dkt. 1 ¶¶ 70-73].

Counts III and IV are supported by the following allegations: failing to follow the IEP; failing to ensure that staff followed it; failing to train staff on the IEP or on medication administration; failing to staff the nurse's office during the summer; failing to communicate through the communication book; failing to pull Sousa for exams; failing to call the social worker; and failing to have a staff member supervising him on February 9, 2022. [Dkt. 1 ¶¶ 16, 19, 24, 40-41, 66-69, 70-73]. Each allegation is "an act or failure to act to prevent or diminish" harm. Mass. Gen. Laws Ann. ch. 258, § 10(j). Because these allegations encompass Counts III and IV, which plead nothing beyond a failure to supervise employees, the claims "are barred by § 10(j) because they originate from a failure to act rather than an affirmative act." Cormier v. City of Lynn, 479 Mass. 35, 41 (2018) (holding that a public employer must have taken affirmative action and that a failure to act will not suffice to state a claim under the MTCA).

Thus, Counts III and IV are **DISMISSED**. Section 10(j) immunity does not, however, foreclose every avenue of relief. Where the plaintiff is a student with a disability, a Rehabilitation Act damages claim may reach conduct that Section 10(j) immunizes in tort. Put differently, conduct expressly barred under Section 10(j) is not under the Rehabilitation Act. The Court addresses those claims in Section III. E. and F. below.

**D. Intentional Infliction of Emotional Distress (Count V) and Intentional Infliction of Emotional Distress via Respondeat Superior (Count VI)**

Under the MTCA, common-law immunity is "abrogated . . . only in narrow circumstances," and "[i]ntentional torts are expressly exempted from the [MTCA], and therefore a public employer cannot be sued for its employee's intentionally tortious conduct." Nelson v. Salem State Coll., 446 Mass. 525, 537 (2006) (citing Mass. Gen. Laws ch. 258, § 10(c) (1978)). As noted above, CCSL qualifies as a public employer under the MTCA. Here, Plaintiff brought a claim of intentional infliction of emotional distress and intentional infliction of emotional

distress via respondeat superior against CCSL. Plaintiff did not sue any individuals. Because these claims are for intentional torts[4], Counts V and VI are explicitly barred by the MTCA, and **DISMISSED**.

**E. Discrimination in Violation of Section 504 of the Rehabilitation Act (Count VII)**

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To succeed on his Section 504 claim, Sousa must prove that (1) he is disabled; (2) he "sought services from a federally funded entity"; (3) he was "otherwise qualified" to receive the entity's services; and (4) he "was denied those services" solely on account of his disability. Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001).

Where the challenged conduct does not reflect official policy, an additional showing is required: "an institution cannot be held liable in cases that . . . do not involve official policy of the recipient entity . . . unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond . . . . In such cases, a response is inadequate if it amounts 'to deliberate indifference to discrimination.'" J.S.H. v. Newton, 654 F. Supp. 3d 7, 22 (D. Mass. 2023) (quoting Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998)).

---

[4] The Complaint does not clearly allege an intentional tort. to the extent Plaintiff's allegation that Defendant's employees "physically put their hands on Plaintiff" is intended to state such a claim, that claim fails for an independent reason: public employers are not liable for the intentional torts of their employees. See Mass. Gen. Laws Ann. ch. 258, § 10(c) (public employer not liable for employee's intentional torts); Theisz v. Mass. Bay Transp. Auth., 495 Mass. 507, 518 (2025).

At the outset, the Court notes that CCSL does not challenge the merits of any of Sousa's federal claims. With its administrative exhaustion argument set aside, CCSL neither shifts the evidentiary burden back to Sousa nor preserves any merits-based defense. As such, CCSL has waived any argument challenging the merits of Sousa's Rehabilitation Act claim. See, e.g., Mackey v. Town of Tewksbury, 433 F. Supp. 3d 116, 163 (D. Mass. 2020) ("Defendants' failure to adequately develop the [merits] argument as pertaining to the [Rehabilitation Act] claim amounts to a waiver of the argument for purposes of their summary judgment motion."). For thoroughness, however, the Court assesses whether the claim is triable on the merits.

The first three elements are effectively uncontested, and each is met. *First*, Sousa has been diagnosed with disabilities including mood disorder and ADHD, which limit activities such as school by impairing his emotional regulation. [Dkt. 53 ¶¶ 6, 11]. *Second*, Sousa sought services through his IEP from CCSL, a recipient of federal funding. [Id. ¶¶ 1-2]. *Third*, Sousa was qualified to receive those services: he holds a statutorily protected right to a Free Appropriate Public Education ("FAPE"), and CCSL ultimately agreed to an IEP for his third-grade year designed specifically to accommodate his "educational disability." [Id. ¶¶ 25, 30]. The inquiry therefore turns on the fourth element and on institutional liability—whether Sousa was denied his IEP services solely because of his disabilities, and whether CCSL had actual knowledge of that practice yet responded with deliberate indifference.

Courts have permitted Rehabilitation Act discrimination claims to proceed where the institution had "actual knowledge" of the discrimination through internal complaints and then displayed deliberate indifference by its "fail[ure] to take into account the alleged continuing discrimination," leaving the plaintiff "more liable or vulnerable to [discrimination]." See J.S.H., 654 F. Supp. 3d at 23 (internal quotations and citations omitted). A jury could reasonably reach

that conclusion here. As discussed above, DESE found that CCSL failed to properly implement Sousa's IEP for the 2021-22 school year; in particular, DESE noted that Sousa had requested implementation of a positive behavioral intervention support plan, but that CCSL instead "continued to penalize" him "for his disability related behaviors." [Dkt. 52-6 at 98]. From that evidence, a jury could reasonably find that Sousa's request gave CCSL actual knowledge of the problem, that CCSL disregarded the request, and that it continued disciplining him because of his disability—a deliberate denial of his IEP services solely on account of that disability. Accordingly, CCSL's Motion for Summary Judgment as to Count VII is **DENIED**.

### F. Hostile Learning Environment in Violation of Section 504 of the Rehabilitation Act (Count VIII)

"Although neither the ADA nor the Rehabilitation Act specifically address harassment claims, courts have held that harassment is actionable under those acts." Gaither v. Barron, 924 F. Supp. 134, 136 (M.D. Ala. 1996) (collecting cases). To establish "hostile learning environment harassment under the . . . Rehabilitation Act," a plaintiff must show "(1) that []he is a member of a protected group, (2) that []he has been subject to unwelcome harassment, (3) that the harassment is based on a protected characteristic, h[is] disability, (4) that the harassment is sufficiently severe or pervasive that it alters the conditions of h[is] education and creates an abusive educational environment, and (5) that there is a basis for institutional liability." Guckenberger v. Bos. Univ., 957 F. Supp. 306, 314 (D. Mass. 1997). "The basis for institutional liability can include 'deliberate indifference'" to the alleged wrongdoing. Tveter v. Derry Coop. Sch. Dist. SAU #10, No. 16-CV-329, 2018 WL 3520827, at *5 (D.N.H. July 20, 2018), aff'd, No. 21-1041, 2023 WL 4571963 (1st Cir. Mar. 3, 2023) (quoting S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty, 819 F.3d 69, 74-75 (4th Cir. 2016)).

In applying that framework, courts treat hostile work environment standards as

transferable "to hostile learning environment claims brought under the federal statutes prohibiting discrimination against persons with disabilities." Guckenberger, 957 F. Supp. at 314 (internal quotation marks and citations omitted). Under either variety of hostile environment claim, a court should consider the "'totality of the circumstances,' including the frequency of the discriminatory conduct, its severity, whether the alleged conduct is physically threatening or humiliating rather than a mere offensive utterance, and whether it interferes with the plaintiff's performance." Guckenberger, 957 F. Supp. at 315.

Four of the five elements are present here. First, as a student with documented disabilities, Sousa is a member of a protected class. Second, he was subjected to unwelcome harassment when (a) he was repeatedly disciplined for disability-related conduct and (b) Mrs. Moriarty pulled his desk out from under him, publicly humiliating him and preventing him from sleeping. Third, a jury could reasonably find that this harassment was based on his disability, because it punished disability-related behavior notwithstanding CCSL's knowledge of an IEP that required accommodation such as access to a social worker and opportunities for sleep during the school day. And for the same reasons discussed in connection with Count VII, a jury could find a basis for institutional liability: CCSL allegedly failed to act despite actual knowledge of the conduct, exposing Sousa to further discrimination and demonstrating deliberate indifference to employee-on-student misconduct satisfying the fifth element.

However, closer attention is warranted for the fourth element—whether the harassment was sufficiently severe or pervasive to alter the conditions of Sousa's education and create an abusive educational environment. Genuine disputes of material fact preclude summary judgment on that question, and a jury could reasonably conclude that CCSL's disciplinary practices and Mrs. Moriarty's conduct cleared the threshold. Punishing Sousa for disability-related conduct

and denying him sleep despite his medically induced drowsiness could, as the DESE and DCF reports state, alter the conditions of his education by preventing full participation in school and reducing his engagement with class content after midday. See Guckenberger, 957 F. Supp. at 314-15 (identifying whether the hostility "interferes with the plaintiff's performance" as a factor in a hostile environment claim); see also Cook v. Entergy Nuclear Operations, Inc., 948 F. Supp. 2d 40, 46 (D. Mass. 2013) (allowing a hostile work environment claim where disability-based harassment stating "may be construed as severe and pervasive enough to interfere with a reasonable person's work performance").

Mrs. Moriarty's conduct standing alone satisfies this element. As DCF found, her actions present "reasonable cause to believe that [Sousa] was neglected." [Dkt. 53-3 at 5]. That neglect both created a "potential risk for him to get hurt" and inflicted public humiliation that, in DCF's words, "caused Sousa to feel targeted and to feel as though he is being treated differently than his peers." [Id.]. Thus, a jury could reasonably determine that this behavior, by itself, created an abusive environment for a third grader. See Guckenberger, 957 F. Supp. at 315 (noting that courts consider "whether the alleged conduct is 'physically threatening or humiliating rather than a mere offensive utterance'" in hostile learning environment claims).

The severity of that incident aside, the frequency of the discrimination points the same way. The "daily" disciplinary infractions Sousa received for disability-related conduct, [Dkt. 53-3 at 9], reflect a pervasiveness from which a jury could find an abusive environment. See Guckenberger, 957 F. Supp. at 315 (identifying "the frequency of the discriminatory conduct" as a factor in hostile environment claims); Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 93 (1st Cir. 2018) ("Here, [the plaintiff] produces evidence that she was taunted about her age nearly every single day for over two years."); Flood v. Bank of Am. Corp., 780 F.3d 1, 11 (1st Cir.

2015) ("We have upheld hostile work environment claims where harassment has been more pervasive than severe . . . ."). Accordingly, CCSL's Motion for Summary Judgment as to Count VIII is **DENIED**.

**G. 42 U.S.C. Section 1983 (Count IX)**

To state a Section 1983 claim against a municipality, a plaintiff must show that "the municipality itself causes the constitutional violation at issue." Del Rosario ex rel. Burke v. Nashoba Reg'l Sch. Dist., 502 F. Supp. 3d 623, 636 (D. Mass. 2020) (quoting City of Canton v. Harris, 489 U.S. 378, 387 (1989); citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978)) (emphasis omitted). Neither respondeat superior nor vicarious liability supplies that causal link. Id. As the Supreme Court put it, "[a] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 690-91 (emphasis omitted).

A municipality may nonetheless answer for an employee's constitutional violation where "execution of [the municipality's] policy or custom . . . inflict[ed] the injury." Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (quoting Monell, 436 U.S. at 694) (alterations in original). A plaintiff may proceed on either theory—an official policy or an official custom—and each carries its own requirements.

An official policy may be established by showing, "inter alia," that the constitutional injury was caused by a person with final policymaking authority. Walden v. City of Providence, 596 F.3d 38, 55 (1st Cir. 2010) (internal citation omitted). Whether an official holds that authority is a question of state law. Id. at 56. In Massachusetts, "the school committee in each city or town has policymaking authority." Thomas, 267 F. Supp. 3d at 306 ("Under Massachusetts law, the school committee in each city or town has policymaking authority.")

(internal citation omitted) (citing Mass. Gen. Laws ch. 71, § 37 ("The school committee in each city and town . . . shall establish educational goals and policies for the schools in the district . . . .")).

An official custom, by contrast, requires a plausible showing that the practice is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022) (internal citation omitted). The plaintiff must further show that "the custom [was] the cause of and the moving force behind the deprivation of constitutional rights." Wood v. Hancock Cnty. Sheriff's Dep't, 354 F.3d 57, 64 (1st Cir. 2003) (internal citation omitted). Isolated conduct will not do: "[l]iability may not be imposed on a municipality for a single instance of misconduct by an official without final policymaking authority." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 769 (1st Cir. 2010).

A municipality's failure to train its employees may also be actionable under Section 1983, but only where "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011) (citations omitted).

Sousa's claim fails at the threshold because the record discloses no CCSL policy or custom of discrimination. Mrs. Moriarty is a teacher; she does not sit on the school committee and holds no policymaking authority. Her conduct therefore cannot be attributed to CCSL as official policy. And, while it is undisputed that CCSL failed to adhere to Sousa's IEP, a failure to implement one student's IEP does not itself amount to a policy of discrimination.

Absent such a policy, no direct causal link runs between CCSL and the alleged constitutional deprivation. See Whitfield v. Meléndez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005).

Sousa has produced no evidence from which a reasonable jury could find any official or unofficial CCSL policy of discriminating against students with disabilities. Accordingly, CCSL's Motion for Summary Judgment as to Count IX is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, CCSL's Motion for Summary Judgment [Dkt. 52] is **GRANTED IN PART** and **DENIED IN PART**. CCSL's motion is **GRANTED** as to Counts I, II, III, IV, V, VI, and IX which are hereby **DISMISSED**. The motion is **DENIED** as to Counts VII and VIII.

**SO ORDERED**.

Dated: August 27, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge